Civil action. The material facts are as follows: *Page 650 
Eugene B. Graham, Jr., the plaintiff, testified, in part, as follows:
"I am plaintiff in this action; was 22 years old on 18 June, 1919. I was a clerk at the Charlotte Supply Company after I returned from France. I worked for Burwell Dunn Company about three years; was working there when I went to France, at a salary of $15 or $20 per week. I was learning the drug business. I went to France on 8 May, 1918, remaining there between ten and eleven months. I got back from France on 2 April, 1919. I was with the Thirtieth Division, Machine Gun Company, practically all the time, except when I was in machine-gun school. I was sergeant, and they sent three sergeants from the company to this school at Langres. I was honorably discharged from the Army when I got back. After I got back I loafed a month, trying to get back to civilian life, and then went to work at the Charlotte Supply Company at a salary of $15 a week. I was injured on 11 July, 1919. I was on a truck on Seventh Street. The truck was the property of Sloan Sherrill's father. It was a straw ride. Sloan Sherrill was driving. I was called on the phone and invited to go. I had nothing else to do with the ride, except to go by invitation. I was injured at night. We had gone to Rhyne's Park. Sloan Sherrill and Laura Alexander invited me to go. The ride was given in honor of Miss Helen Fewell, of Rock Hill. Dr. J. R. Alexander and his wife were chaperoning the party. They accompanied us back to town in a separate car. The sides of the truck were taken off and cushions placed around the sides, so we could sit that way. I mean the uprights were taken off. Had automobile cushions. There were about fifteen or sixteen people on the ride. As we sat on the cushions on the side of the truck our feet were hanging over the side of the truck. Immediately before the injury, we came up toward the Elizabeth section to take the guests home, and were coming back towards Charlotte, on Seventh Street. Sloan Sherrill was driving. The truck had a closed cab. That (referring to the photograph) is the kind of cab the truck had on it, and the kind of truck, with the exception that the sides were off. As we were coming into Charlotte, on East Seventh Street, I was riding on the right-hand side, coming into Charlotte. I was the first on that side, immediately behind the cab. Sloan Sherrill and Laura Alexander were in the cab. Miss Helen Fewell sat next to me; E. Y. Marsh sat next to her. Fred McCall and J. R. Alexander, Jr., were also on the right. Some of the others were sitting in positions similar to mine, on the left-hand side. The moon had been up, but I think it was going down. It was either going down or it had gotten cloudy. It wasn't as light as it had been when we started. It was not pitch-dark, but it was not very light. As to the first notice I had of *Page 651 
being in danger, I don't know whether I heard some one holler or not. I had my head back, talking to this lady, and when I turned I was hit. I was looking back towards the rear of the truck. The lady was between me and Mr. Marsh. I do not know anything about the fact that we were crossing this bridge. I could not see the outlines of the bridge. I was mashed between the fourth post and the side of the bridge. By the fourth post I mean the farthest toward Charlotte. After I was hit I was knocked off — about 10 feet, I guess; and I must have been stunned, and when I came to I was lying on the street or sidewalk. I tried to stand up and go after the truck, and couldn't stand up. I looked up, and my foot was practically off — just hanging by a little piece of flesh. I sat down and waited until the party came back. My right foot was hurt. It has a scar where it was hurt. My left foot was amputated. The X-ray showed a fracture of the large bone of my right leg, but it knitted back together by itself. The ankle was twisted, and it was about two months before it got straight, and at times now, when I walk a great deal, it bothers me. It hurts in the arch. I was taken to the hospital shortly after I was injured. Dr. Gibbon amputated my left leg, and Dr. Scruggs assisted him. I was suffering immensely by the time I got to the hospital. I had one foot off and one great big piece of flesh out of the other. They amputated the leg that night. After I came from under the influence of the anesthetic I suffered immensely. I could not sleep in the day or at night. I had to put both legs in a certain position in the bed, and could not move. Every time I moved the nurse had to move me. I was under the influence of narcotics for a long time. I was in the hospital from 11 July to 5 September, and was then taken home. I was confined to the bed about two months after I got home, and confined to the house after that for several weeks. After I finally got out, for the first few weeks, I couldn't even use crutches. I had to be carried to the office and back. They would take me in the morning and get me again at night. Then I walked on crutches for about a year and a half. Then I got this artificial leg. After I got home I suffered pain. My medical and hospital bills aggregated about $1,000. The fact that I lost one of my legs interferes with my ability to get about and attend to my business, especially during the hot weather. Year before last, during the hot weather, I had to take off this artificial leg for about two months, on account of the heat. It galled the leg, and pus formed, and I couldn't wear it. I am still working for the Charlotte Supply Company as a clerk. I have suffered humiliation and mental anguish on account of being crippled. I would say the truck was going at a speed of between 15 and 18 miles an hour." *Page 652 
S. S. Sherrill testified, in part, as follows:
"I am a mechanical engineer; graduate of Clemson College. I was driving the truck in question, which belonged to my father. On that night I happened to be driving the truck, as Miss Alexander and I had arranged to give a party for Miss Helen Fewell, of Rock Hill. I furnished the truck, at the request of Miss Alexander, and drove it. She invited the guests. The seats were just automobile seats placed around the edge. I put them there — placed on either side and behind. I have a diagram of the truck, and also the dimensions of this bridge, railing and posts, as they existed at the time of this injury, and also as to the location of the parties on this truck at the time of the injury. The blueprint you show me is a correct diagram and truly represents the place where the truck struck the westerly post. (Witness here draws a diagram on the floor.) The line nearest the jury box is the outside railing; there is a hand-railing along there; that is on the northerly side. I took the measurements on 15 October, 1921. The conditions were the same immediately after the injury. Before the night of the injury I didn't know anything particular about the relative location of the pilaster and side-railing with reference to the curb of the street. The line nearest the jury box is the hand-railing on the north side of the bridge. The railing is concrete, with a 4-inch channel brace under it. If the curbing on the easterly and westerly sides of the street were to continue, the street line would run parallel to this line — that is, parallel to the outside line. The westerly pilaster extends from the curb, if it were extending in a straight line, 22 inches, plus or minus, into the street. By plus or minus I mean that the measurement is not exact. On the easterly end of the bridge the post extends out beyond the curb line into the street 15 inches. The dimensions of the pilasters are approximately 18 inches square. The rail between the pilasters is approximately 12 inches wide. The diagram here represents the truck at the point I suppose it struck. I examined it the next day after the injury. Figure 1 represents myself, driving; number 2, Miss Alexander; number 3, Mr. Graham; number 4, Miss Fewell; and number 5, Mr. Marsh. I had kerosene lights on the truck — standard lights for trucks. The bed was 6 feet 1 inch wide. There is a standard. They make them even wider than that. I put those cushions on it. As we approached the Seventh Street bridge the truck was running about 15 or 18 miles an hour. The truck is regulated to a maximum speed of from 16 to 18 miles. It will not run any faster than that. The motor will be cut off if it exceeds that speed. The motor was running at that time. As we approached that bridge, there were no lights there. You could just see a bridge, and that was all, and you just assumed that the railing was there. On account of the condition of the night, and the *Page 653 
lights, or the lack of them, I couldn't see the location of these pilasters. I didn't know that the pilasters on that bridge, next to the traveled way of the street, extended out into the street beyond the curb line. I was not able to ascertain that fact that night. As I was driving along I was just using ordinary precautions of driving, watching the road and seeing if there were any rough places, to get out of them. I was looking ahead. It was rough. The street had a hole in it, and I turned to miss it. I can't say exactly what the dimensions of that hole were. I would say it was eight or ten inches wide, about a foot or two feet long, and one and one-half or two inches deep. When I saw that hole I swerved to the right; I don't think it was but very little. I can't say whether I missed the hole. At the time I did not discover that any part of the car had struck the westerly pilaster. Somebody hollered to me to stop. The bed of the car extends further out than the fender. The corner of the bed actually hit the pilaster. No other part of the car struck it that I know of. I did not discover any evidence of it (witness marks the corner of the west pilaster at this point where the bed of the truck struck). There was a clamp here (indicating right side of truck near the front) to hold the stakes and that was just sheared off and there was a mark on the pilaster where it hit. There was no mark, due to the truck, on any of the other pilasters. From the curb line to the outside or southerly line of the westerly pilaster is twenty-three inches."
J. B. Spratt, testified, in part, as follows:
"I have been in the profession of engineering and surveying for about thirty years. We call the direction coming into Charlotte west. There is a railing on the left-hand side coming into Charlotte. There are four concrete posts and two concrete railings. They are located on the property line — located on the outside of the edge of the cement sidewalk. The curb line is next to the street. There is nothing there except the curb line. As you come into Charlotte, from the left-hand curb the line to the nearest street-car line is eleven and one-half feet. There are two street-car lines there. These first two parallel lines above the curb line of the left-hand side represents one street-car line. Between the left-hand street-car line coming into Charlotte and the right-hand street-car line there is a space of five and one-half feet. From the right-hand track or the northerly side of the right-hand car line coming into Charlotte, to the westerly post on the bridge on the right-hand side as you come into Charlotte, there is a space of about ten feet. The nearest street light east of the bridge was 565 feet from the west post or line on the north side of the street. The nearest light from the westerly post of the bridge was 162 feet. The northerly line parallel to the curb represents the property line. The four white squares along, or near this curb line, represents concrete posts and railings on the *Page 654 
curb. The easterly post extends out into the street south of this curb line one and three-tenths feet. The westerly post extends out into the street south of the curb line two feet. The curb line there is well defined. It is about six inches above the surface of the street. Coming to the westerly post of the bridge, that curb line, if it had been extended in a straight line to the easterly side, would have been four-tenths of a foot north of the north side of the west post. If that curb line had been extended in a straight line and parallel with the property line on the northerly side, from the easterly to the westerly post, the south side of the westerly post would have projected two feet into the street. From the outside line of the easterly post to the outside line of the westerly post is thirty-one and eight-tenths feet. The width of that post as it fronts on the street is one and six-tenths feet. It is a square post. The other posts are of the same dimensions, constructed of concrete, sand and gravel, kind of brown in color. As to coming down this street here going west, the street is thirty-eight and four-tenths feet wide from one curb to the other. I don't think the original bridge as constructed there had any sidewalks. The guard rails on either side of the bridge were originally on the outside of the bridge. Subsequently, under the administration of Mr. Lee, who was city engineer, the city undertook to construct two sidewalks, one on either said of the bridge. The one on the south side, they left the original guard rail, and post, as they were constructed; and then they built a sidewalk with an ordinary curbing some six inches above the traveled way of the street. When they went to the north side, they left the original guard rail and posts where they were, and undertook to build the sidewalk on the north side of the original guard rail; and in so doing, they changed the general direction of the street, thereby leaving this guard with an ordinary curbing some six inches above the traveled way of the street. I stated that in my opinion this bracket sidewalk on the north side of the street was not strong enough to hold up vehicles. It could be made strong enough."
E. L. Mason, testified, in part, as follows:
"Have lived in Charlotte about 23 years. Was an alderman of the city for eight years. I remember the time that the city constructed the sidewalks on the north and south sides of this Seventh Street bridge. I was an alderman at that time, being chairman of the finance committee. While that work was being done I sometimes drove across that bridge, going to and from home, and observed what was being done. As this work of construction of the sidewalk across the bridge progressed I noticed that the pilasters and guard rails on the north side of the bridge were left out in the street. I took that up with the board at its next meeting and stated to the board that work was being allowed *Page 655 
to be done — that those pilasters and columns were extending out in the street. After I gave the board that information no order was made for the removal of those pilasters and guard rails from the traveled way of the street. The pilasters and guard rails are located, and were located at the time this young man was injured, just as they were when I notified the board of the facts that I have narrated."
Osmond L. Barringer, testified:
"I was an alderman of the city of Charlotte. I think it was 1914, 1915 and 1916. Prior to the time Mr. Graham was injured at this Seventh Street bridge I had knowledge of the condition or location of the pilasters and guard rails on the north edge of the traveled way of that bridge. I observed that the west end abutted about 24 inches into the traveled way of the road; extended out beyond the straight curb line, if it had been extended; that the east end of lit was about flush. In consequence of that observation on my part I notified Mr. Wearn, who was at that time Commissioner of Buildings, or Commissioner of Public Works. I told him the guard rails on Seventh Street bridge projected out into the street. I don't remember if I told him exactly how far. That was in the fall of 1917."
Dr. Jas. R. Alexander, testified, in part:
"Before this accident I noticed the position of the pilasters and the guard rail on the north side of the street to this extent, in passing there, I came near running into it. The pilasters are on the right-hand side of the street. After the accident I made an examination of the premises, the next day. The west pilaster is about twenty-four inches into the street. The east pilaster is about twelve to fifteen inches from the curb into the street. There were holes in the street between the car tracks, between the two car tracks, way up on the east side of the bridge. As you get down to the bridge there was a large hole in this right-hand track. It extended from track to track about three feet long and four or five inches deep; along by the car track was a small hole; there were some other holes right near the car track and some near the cement. There were also holes in the bitulithic. The holes in the north side of the track were right by the cement. There was one that I could call a hole, then a sink for draining the water. The next day I observed the traveled way on the north side of that street with reference to those holes; the traveled way was on the north side of that street with reference to those holes; the traveled way was on the north side of the hole that I have described."
There was other testimony for the plaintiff corroborating the evidence before set forth.
The defendant, the city of Charlotte, introduced the following evidence: *Page 656 
Ordinance of the city of Charlotte, section 408, subsection 40, reading as follows: "That no one shall ride or jump onto any vehicle without the consent of the driver thereof; and no person, when riding, shall allow any part of his body to protrude beyond the limits of the vehicle, nor shall any person hang onto any vehicle whatsoever."
The notice of claim to the city of Charlotte is not set out in full, as we think it is a substantial compliance with the law.
The defendant introduced section 133 of chapter 342 of the Private Laws of 1907, which conferred upon the Board of Public Service of Charlotte the following power: "That said board of public service shall have full power and authority, under the ordinances of the board of aldermen, to grade, pave, macadamize and otherwise permanently improve for travel and drainage, any street, sidewalk and public alley of said city; to put down curbing, cross drains and crossings on the same; to lay out and open any streets, or widen those already opened, and make such improvements thereon as the public convenience may require."
It also introduced section 219 of its City Code, which abolished the board of public service and transferred all of its power and authority to the Executive Board, to consist of five. The defendant introduced two members of this board, to wit: Dr. J. A. Austin and Mr. J. E. Morris.
Dr. Austin, testified, in part:
"At the time that spot was taken into the city, and that street widened, I was on the executive board. I had something to do with the supervision of the work of putting this sidewalk down on the north side, it was put down during our administration. Those things were ordered by the board of aldermen, were laid out by the city engineer, and the board of aldermen made the order and we, just as a set of commissioners, executed that order. I know how the sidewalk on the north side was constructed. Mr. Lee, the city engineer, made a plan of the bracket that extended from the end of the bridge. This end of the bridge stopped here. The bridge goes practically with that sidewalk, or the inside curbing. That leaves those barriers standing up. There was nothing over that to support the sidewalks, and they put in some brackets to support that for pedestrians. The brackets on the north side were put into the cement. We left those concrete posts and railings in the same position they were in before the street was widened. As to why we left those posts and railings in their position on the north side, I will say I went down there while they were putting in the construction of that sidewalk. Just as they finished it, Mr. Morris and myself went down, and we saw the barriers there, and they are very nearly on the curb line — eighteen inches off on the west *Page 657 
line, and thirteen inches on the east end, and we, knowing that the flimsy sidewalk was there, and in that day, horses were very scary of automobiles and street cars, and there was a considerable amount of travel at the intersection of Seventh Street and Central Avenue, which made a heavy travel, and we thought for the safety of the public, we better leave them there. They were large, and very easily seen. If a horse got scared of a street car, and we knew if a horse jumped over on the sidewalk, it would break, and that was our idea in leaving them there."
Mr. Morris, testified:
"We didn't do anything in reference to those posts and railings. We didn't move them because we thought it would be safer to leave them there, than to take them away, for the traveling public. We thought that on account of the way the sidewalk is constructed. That is about all I know of that. The sidewalk was built on brackets, and that is the condition we found, and to have taken down these posts, in our opinion — someone else might have thought different — it was safer to leave them."
The jury was permitted to go out and examine the premises in the day-time, in company with the sheriff and nobody else to be present but the jury and sheriff, to make such examination as they desired. Then they were permitted to go there in the night-time, about eleven o'clock, in a truck, situated as nearly as possible as the plaintiff was on the night of the injury, and approach the bridge from the east, and make such examination and investigation as they desired, with reference to the conditions as they obtain in the night-time, with reference to the location of the lights, and being able to see the posts, etc., with the understanding that it was admitted that if the jury should find as a fact that there were holes in the street at the time of the injury as described by the plaintiff's witnesses, or any of them, and that they are not there now, that they have since been filled up by the city.
The issues submitted to the jury and answers were:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.
2. Did the plaintiff, by his own negligence, contribute to his said injuries, as alleged in the answer? Answer: No.
3. What damages is the plaintiff entitled to recover? Answer: $6,000."
The plaintiff moves the court to set aside the verdict on the third issue upon the ground that from the undisputed evidence it is manifestly grossly inadequate; so much so that it is contrary to all the evidence in the case, and is unsupported by any of the evidence in the case. Motion overruled. Exception. *Page 658 
The court signed the judgment in the cause tendered by the defendant to which the plaintiff excepted.
Usual appeal entries.
To the foregoing judgment the defendant excepted and appealed.
Usual appeal entries.
Attorney for the defendant, after the judgment was signed, stated he understood that the attorney for the plaintiff would not tender a judgment upon the verdict. With this understanding, the attorney for the defendant did prepare a judgment upon the verdict for the convenience of the court and in order to get the record complete presented it to the court, but understood that in so doing he would not prejudice his rights of appeal and the court was of the same opinion.
The defendant assigned as error:
"1. That his Honor erred in overruling the defendant's motion, for nonsuit, made at the close of the plaintiff's evidence.
"2. That his Honor erred in overruling the defendant's motion for judgment of nonsuit, made at the conclusion of all the testimony."
Before bringing an action for damages against the city of Charlotte, the following is necessary to be done, under the amended charter: "No action for damages against said city of any character whatever, to either person or property, shall be instituted against said city unless within six months after the happening or inflicting of the injury complained of, the complainant, his executors or administrator, shall have given to the board of aldermen of said city notices of such injury in writing, stating in such notice the date and place of happening or infliction of such injury, the manner of such infliction, the character of the injury, and the amount of damages claimed therefor, but this shall not prevent any time of limitation prescribed by law from commencing to run at the date of happening or infliction of such injury or in any manner interfere with its running." Private Laws 1911, chapter 251, section 15.
The notice was filed in the time limit and all requisites substantially complied with, except on the argument, it was contended that the details as to such injury "the manner of such infliction" was not sufficient, that in the pleading there were more allegations as to the "manner of such infliction" than set out in the notice. The notice states: "Which injuries were caused and produced by reason of the negligence of the city of Charlotte in permitting and maintaining a permanent obstruction in Seventh Street in said city, where the same crosses Little Sugar *Page 659 
or Town Creek, which obstruction consisted of a large concrete post or pillar, which the said city built and permitted for a long time to remain entirely in the traveled way of said street beyond the curb line of the sidewalk. By reason of which construction, plaintiff while riding an auto truck, being driven by a third party, has his legs crushed, broken and mangled."
"The provisions of the statute prescribing the terms and contents of the notice, such as the time and place of the accident, the nature of the injury, the defect in the street or highway, or the cause of the injury,must be substantially complied with; otherwise, the condition precedent to the right to maintain the action has not been performed and the action will not lie." 4 Dillon on Municipal Corporations, p. 2819.
"Generally, the notice must set forth the time, place, cause, and character of the injuries sustained. But a substantial compliance with the statute is all that is required, and the notice need not be drawn with the technical nicety necessary in pleading." McQuillan on Municipal Corporations (Vol. VI), section 2718.
We think the statute was substantially complied with. The notice was sufficient to the governing body of the city, which had ample notice of the cause of the injury, and there was nothing to mislead them as to the basis of the action.
On all the evidence, taken in a light most favorable to plaintiff, is he entitled to recover in this case? We are of the opinion that he can.
The defendant states: "In this appeal, as advancing a single proposition, that under well-settled principles of law the plaintiff's own evidence shows that this is not a case of liability. They are not seeking a new trial. No error is assigned in the admission or rejection of evidence, and none in the charge of the court."
For a better understanding of the contentions of the parties, we will have to make repetition of the salient facts as we conceive them to be on the record, so as to apply the law to the facts.
The plaintiff was permanently injured on the night of 11 July, 1919, about 11 o'clock, while on a "straw ride" with a party of about 16 young people. Sloan (S. S.) Sherrill was driving the truck. The upright sides of the truck were taken off and automobile cushions were placed around the sides to sit on. As they sat on the cushions on the side of the truck their feet hung over the sides of the truck. Sloan Sherrill and Miss Laura Alexander were riding in the closed cab of the truck, Sherrill was sitting on the left side of the cab coming into the city on East Seventh Street, and Miss Alexander was sitting on the right. The truck was coming into Charlotte on East Seventh Street. The plaintiff was riding on the right-hand side of the truck. He was the first one on that side, immediately behind the cab, sitting on the side of the truck *Page 660 
with his feet hanging down over the side of the truck. The side of the truck extended over the wheels 6 or 8 inches on each side. The bed of the truck was 6 feet 1 inch wide, the truck was 11 feet and 6 or 8 inches long. Sherrill was driving about 15 or 18 miles an hour, and had had 15 years experience running truck. It was the first time he had driven this truck; it was a new truck. It had kerosene lights, located at the end of the cab, standard lights for trucks, and gave light enough for careful driving on country roads. He had no license to operate a truck. It was dark; the moon had gone down. The nearest street light east of the bridge was 565 feet, and from the westerly post of the bridge was 162 feet.
The place where the injury occurred was on Seventh Street bridge, on the right-hand side of the bridge as the city is approached from the east. On the bridge there are four concrete posts and two concrete railings. From the outside line of the easterly post to the outside line of the westerly post is 31.8 feet. The pilasters, or posts, are all square and of the same dimensions, and the width as it fronts on the street is 1.6 feet. The two rails between the posts are about a foot wide, and the posts and railings are constructed of concrete, sand and gravel, kind of brown color. The concrete posts and foundations jut out into the street beyond the curb line, that is the fixed or marked line that separates the sidewalk for pedestrians' travel from the street or vehicle travel. The easterly posts and foundation juts, or extends, out into the traveled street 1 foot and 3 inches, the westerly post and foundation 2 feet. The street at the bridge is about 38.4 feet wide, with double track for street cars. From the right-hand track, or the northerly side of the right-hand car line coming into Charlotte, to the westerly post on the bridge on the right-hand side as you come into Charlotte, there is a space of about 10 feet. The street had a hole in it 8 or 10 inches wide about a foot or two feet long and about 1 1/2 or 2 inches deep. The truck was going along East Seventh Street on the right side of the street, down grade towards the bridge. The first post that the truck had to pass jutted out into the street 1 foot and 3 inches and the last it had to pass, as the truck was going west, the fourth post, jutted out into the street 2 feet. To the left of the truck was a double car-line track, the hole was opposite the posts that jutted out into the street. The sidewalks on either side were raised some 4 to 6 inches above the level of the street between the curbs. Sherrill said: "As I was driving along, I was just using the ordinary precautions of driving, watching the road and seeing if there were any rough places, to get out of them. I was looking ahead. It was rough. The street had a hole in it, and I turned to miss it. I can't say exactly what the dimensions of the hole were. I would say 8 or 10 inches wide, about a foot or two feet long, and 1 1/2 or 2 inches deep. *Page 661 
When I saw that hole I swerved to the right; I don't think it was but very little. I can't say whether I missed the hole. At the time I did not discover that any part of the car had struck the westerly pilaster or post. Somebody hollered to me to stop." No other vehicle was in sight.
Dr. Jas. R. Alexander testified: "As you get down to the bridge there was a large hole in the right-hand track. It extended from track to track, about 3 feet long and 4 or 5 inches deep; along by the car track was a small hole; there were some other holes right near the car track and some near the cement. There were also holes in the bitulithic. The holes in the north side of the track were right by the cement. There was one that I would call a hole, then a sink for draining the water."
The positions taken by the defendant in its brief are: "(1) The matters complained of rested in the discretion of the city officials and cannot be made the basis of an action; (2) the barrier was not such a defect of construction as to render the city liable for failure to remove."
What is the legislative power given to the city of Charlotte in reference to streets? Under "Municipal Corporations" we have C. S., sec. 2675, which is as follows: "The board of commissioners shall provide for keeping in proper repair the streets and bridges in the town, in the manner and to the extent they may deem best; may cause such improvements in the town to be made as may be necessary," etc.
"The board of commissioners may pass laws for abating or preventing nuisances of any kind and for preserving the health of the citizens." C. S., 2676.
Private Laws of 1907, ch. 342, sec. 133, amended charter of city of Charlotte, is as follows: "That said board of public service shall have full power and authority, under the ordinances of the board of aldermen, to grade, pave, macadamize, and otherwise permanently improve for travel and drainage any street, sidewalk and public alley of said city; to put down curbing, cross drains and crossings on the same; to lay out and open any streets, or widen those already open, and make such improvements thereon as the public convenience may require." This power was transferred by legislative enactments to an executive board to consist of five, and is now under authority of the governing body of the city of Charlotte, consisting of three officials.
The defendant contends that its only duty under the statute is to repair, and it is not liable for methods of construction, as the city officials must exercise their judgment and discretion. The power given by the law relating to the city is in the general State law above to "provide for keeping in proper repair the streets . . . may cause such improvements in the town to be made as may be necessary." In the special act above "permanently improve for travel and drainage any *Page 662 
street, . . . to put down curbing," etc. Under the above law it is the duty of the city to "repair," to make necessary "improvements," "permanently improve for travel," etc. The duty imposed by the statutes, in clear inference, is to both construct and repair. The city has the right to put down curbing, open streets, widen those opened, and nowhere in the above statute does it permit obstructions.
Black in his Law Dictionary defines the word "improvement" a valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement of waste, costing labor or capital, and intended to enhance its value and utility or to adopt it for new or further purposes.
In the instant case the heavy obstructions jutted out into the street beyond the curb line on the east side one foot and three inches and on the west side two feet. Nowhere in the acts is discretionary power given to the city to put obstructions in the street — power is given to "put down curbing," etc. The contention of defendant is not borne out by the meaning and language of the legislative power given.
In Dillon v. Raleigh, 124 N.C. 184, the North Carolina Railroad, with knowledge of the city of Raleigh, "was permitted to enter the corporate limits of defendant city and to cross its streets, and it did cross said street about fifteen feet above the level of the street. The railroad runs diagonally across the street, and its stringers are supported by four sets of upright posts or benches standing in the street. These benches are ten or twelve feet long and about twelve feet apart. They stand at right angles with the railroad stringers and form an acute angle of forty-five degrees with the direct course of the street. The plaintiff, with another lady, was driving a gentle horse along said street in the direction of the railroad crossing, when suddenly the horse became frightened, without any known cause, and dashed through said benches, and the buggy struck the far-off corner of one of them, and the injury complained of was the result."Faircloth, C. J., said: "The main question presented to this Court is, `Is the city defendant liable in damages to the plaintiff for alleged injury?' In some jurisdictions liability in such cases is implied at common law, but in many of the different States, perhaps in all, we find the matter regulated by special or general statutory provisions. In our State, The Code, sec. 3803 (now C. S., 2675) enacts that the commissioners of towns and cities `shall provide for keeping in proper repair the streets and bridges in the town, in the manner and to the extent they may deem best,' etc. And section 3802 (now 2676) says `They may pass laws for abating or preventing nuisances of any kind, and for preserving the health of the citizens.' The duty and power of the municipality thus appear to be ample and complete. If any person shall unlawfully erect an obstruction or nuisance *Page 663 
in the streets of a city, and the town authorities shall permit it to remain an unreasonable length of time, the town and the tort-feasor are jointly and severally liable to the traveler for an injury resulting therefrom, without any fault on his part. The question of primary and secondary liability is for the offending parties to adjust between themselves. The injured party shall have his remedy against either, as they fall under the rule as to joint tort-feasors. Burwell on Personal Injuries, sec. 190."
"Entire highway belongs to public — Purpresture — Nuisanceper se.
"Public highways belong, from side to side and end to end, to the public, and any permanent structure or purpresture which materially encroaches upon a public street and impedes travel is a nuisance per se, and may be abated, notwithstanding space is left for the passage of the public. This is the only safe rule, for if one person can permanently use a highway for his own private purposes, so may all, and if it were left to the jury to determine in every case how far such an obstruction might encroach upon the way without being a nuisance, there would be no certainty in the law, and what was at first a matter of small consequence would soon become a burden not only to adjoining owners, but to all the taxpayers and the traveling public as well. Thus expediency forbids any other rule. But even if it did not, the rule is well founded in principle, for it is well settled that the public is entitled not only to a free passage along the highway, but to a free passage along any portion of it not in actual use of some other traveler." Elliott on Roads and Streets, 2d Vol., sec. 828.
The city authorities of Charlotte, under its charter and C. S., 2675,supra, are given discretionary power to lay out and open streets, widen those opened, improve them as the public convenience may require, to grade, pave, drain, macadamize and otherwise permanently improve for travel any of the streets, and to put down curbing. The governing body of the city, in carrying out this discretion, cannot, when they improve the streets and construct the bridges and drains, fix the curb lines, leave an obstruction or nuisance which materially encroaches on the travel way. The general public is entitled to the entire way unobstructed. This does not mean that in opening the streets or improving them in their discretion they cannot make necessary center plots or parks, but when this is done, and the curb lines established, the way for travel must be left in a condition that is reasonably safe, so as not to unnecessarily endanger or impede travel. At common law any unnecessary or unauthorized obstruction that unreasonably incommodes or impedes the lawful use of a street or highway is a nuisance. These traveled ways must be made and kept in repair and made reasonably safe and convenient for the public. In the present day this duty is more incumbent, *Page 664 
as the highways and streets are now used for quicker travel by truck and automobile, and obstructions are necessarily more dangerous.
We think the position taken here is borne out by a long line of decisions in this State. Bunch v. Edenton, 90 N.C. 431; Russell v.Monroe, 116 N.C. 720; Fitzgerald v. Concord, 140 N.C. 112; Brown v.Durham, 141 N.C. 252; White v. New Bern, 146 N.C. 449; Revis v.Raleigh, 150 N.C. 353; Johnson v. Raleigh, 156 N.C. 271; Bailey v.Winston, 157 N.C. 252; Styron v. R. R., 161 N.C. 78; Darden v.Plymouth, 166 N.C. 492; Bell v. Greensboro, 170 N.C. 179; Sehorn v.Charlotte, 171 N.C. 541; Dowell v. Raleigh, 173 N.C. 202; Ridge v. HighPoint, 176 N.C. 421; Bailey v. Asheville, 180 N.C. 645.
As was said by Hoke, J., in Fitzgerald v. Concord, supra: "The town, however, is not held to warrant that the condition of its streets, etc., shall be at all times absolutely safe. It is only responsible for negligent breach of duty, and, to establish such responsibility, it is not sufficient to show that a defect existed and an injury has been caused thereby. It must be further shown that the officers of the town `knew or by ordinary diligence might have discovered, the defect, and the character of the defect was such that injuries to travelers therefrom might reasonably be anticipated.'"
The defendant contends that the present case is analogous to the Rollins
and Sandlin cases. We do not think that the facts and law, as set forth in the case of Rollins v. Winston-Salem, 176 N.C. 411, are in conflict with the position taken in the instant case. In that case, a water hydrant — something for the protection of all the inhabitants of the city — a public necessity, with nowhere else convenient to be located, was not put on the traveled street-way for vehicles, but the "evidence discloses that this hydrant, like other hydrants in this city, was placed in the edge of the sidewalk next to the curb and just far enough from the curb so that the part of the hydrant to which the hose was to be attached would clear the driveway." The sidewalk at this point is some 7 or 8 feet wide and is paved from property line to curb with concrete. The hydrant was 8 1/2 inches thick and the side of the hydrant farthest from the outside of the curb was 15 1/2 inches. A space of 6 to 7 feet of sidewalk was left for pedestrians. It was also in evidence that at Peterson Avenue, 316 feet away, and at White Street, 468 feet away, there was a high-power electric light. There was evidence that the injury was at night and on account of the presence of a tree near the hydrant and the distance from the street lights it was dark. Allen, J., in that case said: "Persons using the sidewalk are required to take notice of these conditions and of the uses to which the sidewalks may legitimately be put. They `must take notice of such structure as the necessities of commerce or the convenient occupations of dwelling-houses' require. Russell v. Monroe, 116 N.C. 727." *Page 665 
We do not think the position taken by this Court in Sandlin v.Wilmington, 185 N.C. 257, is in conflict with the case at bar. That case holds "A municipal corporation is not authorized to maintain a nuisance (defective sewer causing vile and sickening odors), and an action will lie against it for damages to property resulting therefrom, regarded and dealt with as an appropriation of the property to the extent of the injury that he has thereby received." Injury to health not allowed in that line of cases are distinguishable from the instant case.
The most serious contention of the defendant is found in its third reason why the plaintiff should not recover:
"The plaintiff's own evidence shows him guilty of such contributory negligence as to bar his recovery. It is admitted that the plaintiff was riding with his feet and legs hanging over the side of the truck. It is also conceded that the following ordinance was in effect in the city of Charlotte:
"`That no one shall ride or jump onto any vehicle without the consent of the driver thereof; and no person, when riding, shall allow any part of his body to protrude beyond the limits of the vehicle, nor shall any person hang onto any vehicle whatsoever.'"
The bed of the truck, which extends further out than the fender, struck the heavy post, and the first person sitting on that side was the plaintiff and he was crushed. His foot was practically cut off, he lost a limb, and, from the evidence, is a cripple for life. The upper post that he was crushed against is nearly a foot further out from the curb line into the street than the first post that juts out one foot and three inches into the street beyond the curb line, which the truck first passed on its way going west. Under all these facts and circumstances in this case, under proper instructions to the jury by the court below, and there being no exceptions to same (the instructions are taken to be without error), the jury found that the plaintiff was injured by the negligence of the defendant, and that the plaintiff, by his own negligence, did not contribute to his injuries. Conceding that Sherrill, the driver of the truck, was negligent, which the evidence does not show, it has been repeatedly held by this Court, and stated as a general rule, "that the negligence of the driver of an automobile will not be imputed to one who is a passenger therein, unless such passenger be the owner of the car, or unless he exercise some kind of control or authority over the driver." White v. Realty Co., 182 N.C. 538, and cases cited.
The facts disclosed in this case show that Sherrill was driving the truck; the plaintiff was a passenger; that Sherrill was driving within the speed limit allowed by law and about 11 o'clock at night, for the lack of lights at the obstructions, it was dark, the moon had gone down. One city light was 565 feet away, the other 162 feet away. He could *Page 666 
not see the posts or obstructions on the bridge. He was coming along East Seventh Street, down hill, towards the city to cross the bridge where the heavy obstructions were located. Could not see the posts or pilasters, did not know they extended into the traveled way of the street beyond the curb line. The way he was going the first post was one foot and three inches in the street and the last one was two feet. He passed the first and hit the last one furthest into the traveled way. He was driving on the right-hand side of the road, the way the law required. The posts were kind of brown color. Two car tracks extended across the bridge. Hole in the street between the car tracks on the east side of the bridge. As you get down to bridge, large hole in right-hand track, extended from track to track, 3 feet long and 4 or 5 inches deep, also alongside track a small hole, other holes and a sink for draining the water. These holes were on the traveled way of Sherrill near the posts or pilasters of the bridge. As he drove over the bridge, Sherrill turned to miss the hole and the truck struck the westerly post or pilaster.
The defendant contends that, as a matter of law, the plaintiff was violating a valid town ordinance — "No person, when riding, shall allow any part of his body to protrude beyond the limits of any vehicle"; that this made the plaintiff guilty of negligence per se, and he could not recover. The plaintiff says if that be true, it is for the jury, under all the facts and circumstances, to say if this violation of the ordinance was the proximate cause of the injury.
We think the position taken by Brown, J., in Taylor v. Stewart,172 N.C. 204, is the correct one: "The plaintiff sues to recover for the death of his child, who was run over and killed by an automobile belonging to the defendant J. W. Stewart. At the time the car was being operated by James Stewart, the son of said J. W. Stewart, a lad of thirteen years of age. A colored chauffeur, who had been sent out with the car by the owner, was sitting beside the lad. His Honor charged the jury that under the law of North Carolina it was a misdemeanor for a person under the age of sixteen to drive an automobile upon any highway or public street, and that it is a circumstance from which the jury may infer negligence, and that it does not necessarily follow that the jury shall conclude it was negligence, but that it is a circumstance to go to the jury. In this his Honor erred. He should have instructed the jury that it is negligence per se for the defendant James Stewart to have driven the machine in violation of the statute law of the State. Zageir v. Southern Express Co., 171 N.C. 692;Paul v. R. R., 170 N.C. 231; Ledbetter v. English,166 N.C. 125. It does not follow, however, that the defendant is liable in damages, for the plaintiff must go further and satisfy the jury by a preponderance of the evidence of the fact that such negligence was the proximate cause of the death of the child. This *Page 667 
question of proximate cause has been much debated, and a very helpful and enlightening opinion upon the subject has been written by Mr. Justice Allen
in Paul v. R. R., supra. Where the facts are all admitted, and only one inference may be drawn from them, the Court will declare whether an act was the proximate cause of the injury or not. But that is rarely the case, and, as is said by Mr. Justice Strong in R. R. v. Kellogg, 94 U.S. 469: `What is proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or legal knowledge. It is to be determined as a fact in view of the circumstances of fact attending it.'"
"The mere fact that the speed of an automobile exceeded that allowed by chapter 107, Laws 1913, at the time of collision with a railroad train at a public crossing, does not of itself prevent a recovery by the owner, where there is evidence of negligence on the part of the railroad, because it would, among other things, withdraw the question of proximate cause from the jury." Shepard v. R. R., 169 N.C. 239.
"Where the owner of an automobile is driving her car upon the streets of a city in violation of an ordinance requiring a license, and the machine is injured by the backing of an express wagon onto the street in such negligent manner as to damage the car, without contributory negligence on the owner's part and which the care of a skillful chauffeur would not have avoided, it is held, that the violation of the ordinance will not bar the plaintiff of recovery in her action for damages, there being no causal connection between the unlawful act and the damages sustained." Zageir v.Express Co., 171 N.C. 692.
"Where a railroad company has provided a gate at a public street crossing of a town to be let down for the protection of vehicles, etc., from passing trains, and it has been shown that the employee in charge has negligently let down his gate in front of an automobile too suddenly for the driver and owner to stop, and has caused him to deflect his course to the damage of the machine and his own injury, without negligence on his part, the fact that the driver was at the time exceeding the statutory speed limit, and was therefore guilty of a misdemeanor, does not alone bar his recovery, such being dependent upon the question as to whether his act was the proximate cause of the injury. Lloyd v. R. R., 151 N.C. 536, where the statute itself is made the basis of the injury, cited and distinguished." Hinton v. R. R., 172 N.C. 587.
Defendant had abundant notice of the obstruction. The obstruction jutting out into the travel-way was called to the attention of the proper officials of the city of Charlotte at the time the street was being improved. They were allowed to remain after notice. The obstructions jutting out into the travel-way from the curb line was in itself notice.
From a careful review of the entire record, we can find
No error. *Page 668