## J. R. OLIVER v. THE CITY OF RALEIGH.

(Filed 24 November, 1937.)

**1. Municipal Corporations § 14—Municipality is required to keep streets and sidewalks reasonably safe for use for which they are intended.**

A municipality is required to keep its streets and sidewalks in reasonably safe condition for the use for which they are intended, the sidewalks reasonably safe for pedestrians, the streets, except at intersections, reasonably safe for vehicular traffic, but this rule does not necessarily mean that a pedestrian is prohibited from using the streets except at intersections, or that he may not recover, upon a proper showing, for injuries received as a result of defects in the streets.

**2. Same—Evidence held to show contributory negligence on part of pedestrian injured in fall on street, barring recovery as matter of law.**

Plaintiff's evidence was to the effect that he was injured in a fall at nighttime when he stepped from the sidewalk into the street, carrying a 160-pound load to his parked car, that at the place where plaintiff stepped into the street there was a five-inch depression where a ditch dug for gas mains had been filled in with broken pieces of concrete and dirt, that plaintiff could not see the depression because it was in shadow cast by cars parked along the curb. On cross-examination plaintiff testified that he had loaded his parked car from the same storage room over that side of the street practically daily for a period of ninety days without seeing the defect or knowing the height of the curb. *Held:* Plaintiff's evidence discloses contributory negligence barring recovery as a matter of law, since he either had implied notice of the defect and failed to take care to ascertain whether he was stepping off the curb at the place of the defect, or, if he were not charged with implied notice, he stepped from the sidewalk into the street at nighttime carrying a 160-pound weight without knowing the height of the curb.

**3. Same—**

A pedestrian stepping into a street other than at an intersection is required to use a higher degree of care for his own safety than when walking along the sidewalk, since he may not presume that the municipality has kept the street, at such place, in reasonably safe condition for pedestrians.

CLARKSON, J., dissenting.

CONNOR and SCHENCK, JJ., concur in dissent.

APPEAL by defendant from *Spears, J.,* at Third April Term, 1937, of WAKE. Reversed.

This is an action instituted by the plaintiff to recover damages for personal injuries sustained by him in stepping from the curb of the sidewalk on the north side of East Davie Street, in the city of Raleigh, into the asphalt street in front of his place of business at night into a defective place in the street, which caused him to fall and suffer serious

injury. The city had permitted a ditch to be cut in the street five feet east of the entrance to plaintiff's storeroom for the purpose of installation of gas or other pipes. The ditch began at the curb and extended out toward the center of the street about five feet and was about eighteen inches wide. It had been filled in with the broken pieces of concrete and dirt which were removed at the time the ditch was dug. At the time of the accident the ditch was 4½ to 5 inches deep at the curb, and its depth gradually lessened as it extended out towards the street.

The plaintiff was a salesman for the Toledo Scales Company and leased a building on the north side of East Davie Street for a storeroom for scales he kept on hand.

On the night of the injury plaintiff drove his automobile as near to the front of his building as he could get due to other parked automobiles, went into his storeroom, got a pair of scales weighing 160 pounds and came out to put the same on his automobile. He stepped off the curb into the depression caused by the ditch then existing, fell and received serious injuries. There was evidence that the parked automobiles cast a shadow across the ditch so that the plaintiff did not see it. The usual issues of negligence, contributory negligence, and damages were submitted to the jury and answered in favor of the plaintiff. From judgment thereon the defendant appealed.

*Jones & Brassfield* for plaintiff, appellee.
*Clem B. Holding* for defendant, appellant.

BARNHILL, J. Ordinarily sidewalks are constructed for the use of pedestrians and public streets for vehicular travel, except at street intersections. This does not necessarily mean that a pedestrian is prohibited from using any portion of a street except at an intersection, or that a city in no event would be liable for injuries sustained by a pedestrian while traversing or walking upon a public street at a place other than an intersection. Each case must be determined upon its merits.

All portions of a public street from side to side and end to end are for the public use in the appropriate and proper method, but no greater duty is cast upon the city than that it shall maintain the respective portions of its streets in a reasonably safe condition for the purposes for which such portions of the streets are respectively devoted. *Kohlof v. Chicago,* 192 Ill., 249; 85 Am. S. R., 335. A municipality is only required to maintain the respective portions of the streets in reasonably safe condition for the purposes to which they are respectively devoted; thus, the driveway must be kept in such a state of repair as to be reasonably safe for horses and vehicles, but not necessarily for pedestrians. 43 C. J., 1006; 16 Ann. Cases, 424; L. R. A., 1917 F., 710; 19 L. R. A., 221.

In each case the way is to be pronounced sufficient or insufficient as it is, or is not, reasonably safe for the ordinary purposes of travel under the particular circumstances which exist in connection with that particular case. 43 C. J., 1011.

But we need not concern ourselves with the determination of the sufficiency of the evidence to establish negligence on the part of the defendant. If the plaintiff's evidence is such as to tend to show that he was guilty of contributory negligence as a matter of law, he cannot recover.

The plaintiff had been occupying the building near which this defect existed for ninety days. He testified: "I have been loading scales all the time since I have been selling them; I had been loading them there every day for ninety days, possibly. I had loaded them from the middle of the street even. I had loaded them from every part around there. I have stepped off of that sidewalk and that curb a number of times at different places, day and night. I never saw that hole before. I had been coming and going night and day for ninety days. I was within four or five feet of the place every time I went out, as a rule, depending on how I could get my car to the curb; if I went straight out I went four or five feet from this hole. I didn't have occasion to look right down in the gutter. I looked ahead of me where I was walking." He further testified: "I would not know how high the curb is there from the street up to the sidewalk level. I would not like to say it—I would not like to say because I would be guessing and I would not like to guess; it would be somewhere between two feet and six feet, but nothing near six feet, I am sure. I should think it would be anywhere between nothing and three feet; I think that that curb possibly would be a little more than one foot high."

If the period of time over which this plaintiff had been using this particular portion of the street and the conditions under which he used it are considered such as to put him on notice of the existence of the defect in the street, then it appears that in the nighttime, while carrying a weight of 160 pounds he walked out into the street without first ascertaining whether he was stepping from the curb at the place of the defect. If he had neither actual nor implied knowledge of the existence of the defect, then it appears from his testimony that while he was carrying a weight of 160 pounds in the nighttime and not knowing the depth of the curb, that is, the distance from the sidewalk line to the street line, he stepped off when he could not see and without first taking care to ascertain the extent of the drop from sidewalk to street. In either event, it would seem to us that this plaintiff has failed to exercise that degree of care for his own safety which the law imposed upon him and that his own negligence was at least a contributing cause of his injury.

He had a right to go into the street, but when he did so it was his duty to take notice of the fact that it was maintained primarily for vehicular traffic, and to exercise a higher degree of care for his own safety than was required of him while using the sidewalk. He had a right to presume that the sidewalk was maintained in a reasonably safe condition for pedestrians. No such presumption was available to him when he stepped off the sidewalk into the street in the middle of the block when he could not see where he was stepping. He was charged with the duty of exercising for his own safety the same degree of care which he demands of the city. Had he exercised such care it appears that this unfortunate accident would not have occurred.

There was error in the refusal of the court to grant the defendant's motion as of nonsuit.

Reversed.

CLARKSON, J., dissenting: The majority of this Court is of the opinion that the defendant's motion for judgment as of nonsuit should have been granted. With this view I cannot agree. The evidence which makes for plaintiff's claim, or tends to support his cause of action, is to be taken in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom. If the evidence in its most favorable light to the plaintiff is subject to an interpretation which would permit a recovery, "the case must be left to the decision of the jury." *Tinsley v. Winston-Salem,* 192 N. C., 597 (599), and cases there cited. With this rule in mind, what are the facts?

Plaintiff was a traveling salesman away from his place of business ninety per cent of the time—a breadwinner. He operated only a storage room, which was not kept open regularly during the day. It had been rented by him for about ninety days before his injury, and was located on one of Raleigh's congested business streets, where traffic was heavy both night and day. He was "on the road" often for three or four days continuously, and when he went to his storehouse it was usually at night and for the purpose of getting new scales to be taken to prospective customers. One evening about 7:30 (in August) he carried a 160-pound scales on his shoulder from his storage room towards his automobile parked near the curb. There was no light from his place of business. Cars were parked on each side of his car, which was 150 feet from a street light. He had never seen any hole in the street at this point and did not know that there was one there. He stepped into a hole approximately five inches deep and eleven inches wide and extending, with increasing shallowness, for five feet toward the center of the street, and fractured his right ankle and is perma-

nently injured.   He declared: "I was looking where I was walking, but I certainly didn't suspect a hole in the middle of the street six inches deep."   The hole had been there open and unrepaired for more than two years, and the stone and old asphalt which partially filled it had become so discolored that it was not readily apparent, hidden in shadow, as it was on the night in question.

The majority is of the opinion that no jury could reasonably find that plaintiff acted as an ordinary, prudent man.   He swore that he was looking where he was walking, and no witness testified to the contrary.   If the jury accepted his version of the case it would necessarily find that he was not negligent, as no one testified to facts directly and unequivocally pointing to negligence on the part of the plaintiff.   To conclude that he was reasonably careful it was only necessary that the jury believe plaintiff, the only eyewitness; to find that he was negligent it was necessary for the jury to do something more, *to deduce negligence* from the circumstances and his conduct.   Granted that a jury *might* have found the plaintiff negligent, a jury also *might* conclude—and this appears to me the more plausible and more probable verdict—that he was not negligent.   See *Doyle v. Charlotte,* 210 N. C., 709; *Duke v. Belhaven,* 174 N. C., 96.   The latter view is strengthened by the fact that *the jury in this case found as a fact that he was not negligent.* When no jury has passed upon the facts, the court is sometimes justified in constructing a hypothetical and abstract set of facts which a jury might reasonably find.   However, when a jury has in fact passed upon those facts a court should be slow, and reluctant, to say that no man could reasonably find the facts to be as they were found to be by the jury.   Whether conduct amounts to contributory negligence in a particular case is largely a conclusion of fact to be arrived at by the jury.   Shearman & Redfield, the Law of Negligence (6th Ed.), Vol. 1, secs. 52-54.   "The court is not at liberty to withhold the question from the jury simply because it is fully convinced that a certain inference should be drawn so long as persons of fair and sound minds might possibly come to a different conclusion."   *Ibid.,* sec. 114, citing *Emery v. R. R.,* 102 N. C., 209.   Here *twelve* jurors, chosen in the usual manner and correctly charged as to the definition of contributory negligence, have unanimously concluded that plaintiff's conduct was that of a prudent man; I am unwilling to join the Court in saying that *no* man can reasonably infer or conclude that he was not negligent.

In 16 R. C. L. (Jury), sec. 3, p. 182, it is well said: "The right of trial by jury, says *Mr. Justice Story,* is justly dear to the American people.   It has always been an object of deep interest and solicitude, and every encroachment on it has been watched with great jealousy. The right to such a trial is incorporated into and secured by the con-

stitution of every state in the Union. In Magna Charta the basic principle of that right is more than once insisted on as the great bulwark of English liberties, but especially by the provision that 'no free man shall be hurt, in either his person or property (*nisi per legale judicium parium suorum vel per legem terrae*), unless by lawful judgment of his peers or equals, or by the law of the land'—a privilege which, according to Blackstone, is 'couched in almost the same words with that of the Emperor Conrad two hundred years before.' The judgment of his peers alluded to in the Great Charter and commonly called, in the quaint language of former times, a 'trial *per pais*,' or 'trial by the country,' is the trial by a jury who are called the peers of the party accused, being of the like condition and equality in the State. The colonists in America brought that right to this country from the parent country, and it has become a part of the birthright of every free man."

Since the majority view has determined the case on the question of nonsuit, I have dealt here with that phase of the case—the *ratio decidendi*—primarily. However, I find myself unable to accept the summary of the general law of the subject as stated in the opinion. As I interpret the cases, persons passing along the streets have the right to assume that the town authorities have properly exercised their powers of supervision and maintenance, that the streets are in reasonable repair for normal vehicular use, that the sidewalks are in a safe condition for ordinary walking, and that dangerous obstructions, holes, and pitfalls have been removed or proper safeguards and warnings set up. *Bunch v. Edenton,* 90 N. C., 434; *Graham v. Charlotte,* 186 N. C., 662; *Russell v. Monroe,* 116 N. C., 720; *Bailey v. Winston,* 157 N. C., 253. In *Gasque v. Asheville,* 207 N. C., 821 (829), we find: " 'The governing authorities of a city are charged with the duty of keeping their streets and sidewalks and water meter boxes in a reasonably safe condition; and their duty does not end with putting them in a safe and sound condition originally, but they are required to keep them so to the extent that this can be accomplished by proper and reasonable care and continuing supervision. It is the duty of the city of Asheville to keep the streets, including the sidewalks and meter boxes thereon and nearby, in proper repair; that is, in such condition as that the people passing and repassing over them might at all times do so with reasonable ease, speed, and safety,' " etc. Such conditions as required by this rule are certainly the ordinary and usual conditions in the municipalities of this State.

No contention was made that holes similar to the one involved here are general and common in the streets of Raleigh. Yet the plaintiff, who did not look for and guard against such holes, is held by the majority to be barred, *as a matter of law,* because he did not foresee and

guard against the rare, the exceptional, and the unusual. In the absence of actual notice of a dangerous condition, a person should not be held to the duty of foreseeing and avoiding a condition which is well beyond the range of normal probabilities.

The majority opinion declares: "No greater duty is cast upon the city than that it shall maintain the respective portions of its streets in a reasonably safe condition for the purposes for which such portions of the streets are respectively devoted." Even under this rule it appears unreasonable upon citizens to declare that a city is justified in leaving a hole such as is described here unrepaired for more than two years. This hole was along the side of the traveled portion of the street, in an area constantly used for parking. The normal use of this section involved the passage of pedestrians to and from their cars. The danger was even greater than it would have been had the hole been in the sidewalk itself, for here it was partially concealed by the shadows and by the closely parked cars. Even if it be conceded that the duty of the city merely involved the maintenance of this portion of the street in a safe condition for vehicles, it appears that there was sufficient doubt as to the safety of the street to require the submission of the question to the jury. Such a hole in the main traveled portion of a street would constitute a trap to the prudent and the reckless motorist alike. Such a rule as that laid down by the majority, if followed by the State highway authorities, would turn our roads into shambles and line our highways with the wounded and dying. Surely it is not unreasonable to hold municipal authorities in the care of a few miles of paved streets to a standard of maintenance which the Highway Commission maintains with a high degree of consistency throughout a system of 8,640.5 miles of "all-weather" road.

I know that this, like every other case, will become the parent stock from which a motley progeny will spring. In those after years when this case, elevated to high authority by the cold finality of the printed page, is quoted with the customary "It has been said," perchance another Court will say, "Mayhaps the potter's hand trembled at the wheel." Possibly when that moment comes these words may give that Court a chance to say, "Yea, and a workman standing hard by saw the vase as it cracked."

In my opinion the case was properly submitted to the jury, and the jury having found for the plaintiff, the judgment of the court below should have been sustained.

CONNOR and SCHENCK, JJ., concur in dissent.